**Fred A. Rispoli, Ariz. Bar No. 026617**
**420 West Roosevelt Street**
**Phoenix, AZ  85003**
**Telephone: (602) 284-5520**
Fred@FredRispoli.com
*Attorney for Plaintiff Shannon O'Leary*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SHANNON O'LEARY, on behalf of herself and all others similarly situation | Case No.: |
| *Plaintiffs*, | **COMPLAINT** |
| vs. | Civil: |
| WALTER JOSEPH CLAYTON, III; WILLIAM HINMAN; JOHN DOES or JANE DOES 1 through 200; BLACK AND WHITE CORPORATIONS 1 through 50 | 1) Tortious Interference With Business Expectancy<br>2) Conspiracy To Commit Tortious Interference With Business Expectancy<br>3) Aiding And Abetting Tortious Interference With Business Expectancy |
| *Defendants*. | |

Plaintiff Shannon O'Leary, individually and on behalf of all others similarly situated, allege the following against Defendants Walter Joseph "Homer Jay" Clayton, III (hereinafter

referred to as "HOMER JAY CLAYTON" or "HOMER") and William Hinman (hereinafter referred to as "WILLY HINMAN" or "WILLY"), based on personal knowledge, the investigation of counsel, and information and belief. Plaintiff believes substantial evidentiary support will exist for and further support the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.    This action stems from the unprecedented actions of two rouge United States Securities and Exchange Commission ("SEC") employees, Defendants HOMER and WILLY, acting completely outside the course and scope of their employment at the SEC. HOMER and WILLY aided and abetted each other in a conspiracy to tortiously interfere with Plaintiff's valid business expectancy in the XRP Ledger (hereinafter referred to as "XRPL") Network by manipulating the SEC into investigating and later filing a federal lawsuit against Plaintiff—and all similarly situated XRPL Network Users—while simultaneously manipulating the SEC into not investigating the Ethereum Network, the latter being a network substantially similar to the XRPL Network but with the primary difference being that HOMER and WILLY's past (and now current) clients had a multi-billion dollar stake in the Ethereum Network. HOMER and WILLY were also hired directly as employees by companies with billion-dollar Ethereum Network investments after each left the SEC (and were also the same companies HOMER and WILLY acted to benefit while at the SEC).

2.    HOMER and WILLY improperly interfered with Plaintiff's valid business expectancy in the XRPL Network by engaging in unlawful, unethical and prohibited action with their former (and now-current) clients while concurrently working as SEC officials in an effort to critically impair the XRPL Network for the benefit of their former (and now-current) clients.

3.    HOMER and WILLY targeted XRPL Network Users because the XRPL Network was direct competitor to former (and now-current) clients in which HOMER and WILLY had well-known, ongoing, and substantial conflicts of interest that each brought with them into their employment with the SEC. Despite repeated warnings from the SEC Ethics Counsel prohibiting HOMER and WILLY from engaging in behavior that directly benefited

HOMER and WILLY's past (and now current) clients—especially while WILLY concurrently received multi-million dollar payments from his prior (and now current) employer Simpson Thacher & Bartlett, LLP (herein referred to as "Simpson Thacher" or "STB")—HOMER and WILLY willfully violated SEC ethics counsel mandates, federal regulations prohibiting government employees from using their positions for personal gain, and common law to exploit their private sector relationships for personal gain.

4.    Throughout their tenure at the SEC, HOMER and WILLY engaged in secret, 'off the books,' and 'ad hoc' meetings with the stakeholders of the Ethereum Network—a direct competitor to the XRPL Network—without the knowledge of other SEC Commissioners and SEC Division Leaders in a plot to destroy the XRPL Network while simultaneously deceiving the public through HOMER and WILLY's sustained public media campaign that their personal opinions represented official positions of the SEC.

5.    Ultimately, HOMER and WILLY's conduct, wholly independent of the course and scope of their employment at the SEC, substantially impaired the business expectancy Plaintiff had in the XRPL Network, causing damages of at least $42 Billion to the proposed Class, though likely in excess of that number. This was done intentionally by HOMER and WILLY to unlawfully target Plaintiff to Plaintiff's detriment and the benefit of HOMER and WILLY's former (and now-current) clients and employers. HOMER and WILLY's benefactors handsomely rewarded them for their exploits immediately upon each leaving the SEC.

6.    After leaving the employment of the SEC, HOMER and WILLY were hired (and in some situations re-hired) by the very entities for whom they acted in their personal capacities to financially benefit while at the SEC—in the face of blanket criminal prohibitions restricting such conduct.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class exceeds $5 Million, exclusive of interest and costs, and the Plaintiff and most members of the proposed Class are citizens of a state different from Defendants.

8.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965 because some of the actions giving rise to this Complaint took place in this District, particularly the harm suffered by Plaintiff O'Leary, whom is a resident of Arizona.

9.    The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including this District.

## THE PARTIES

10.    Plaintiff Shannon O'Leary is a United States citizen and resident of Maricopa County, Arizona. Ms. O'Leary transacted on the XRPL Network and owned more than one XRP token (the digital asset the permits transactions on the XRPL Network) from a time period prior to HOMER and WILLY's initiation of a federal lawsuit against XRP Network Users through the time period of when HOMER and WILLY's tortious interference was reasonably ascertainable by April 8, 2022 (hereinafter "the Class Period" is defined as the genesis of the XRPL Network in June 2012 through April 8, 2022).

11.    Upon information and belief, Defendant HOMER is a United States citizen and resident of New York.

12.    Upon information and belief, Defendant WILLY is a United States citizen and resident of Washington, D.C.

13.    Does 1 through 200 are those persons and/or entities that are the employees and/or agents of Defendants and/or those who aided and abetted Defendants in their conspiracy to tortiously interfere with Plaintiff's business expectancy, whose conduct caused and/or contributed to the injuries alleged herein to Plaintiff but whose identities are otherwise unknown to Plaintiff at this time.

14.    Black and White Corporations 1 through 50 are those persons and/or entities that are the employees and/or agents of Defendants or are persons and/or entities that participated

in Defendants' conspiracy to commit tortious interference in Plaintiff's valid business expectancy in the XRPL Network, whose conduct caused and/or contributed to the injuries alleged herein to Plaintiff but whose identities are otherwise unknown to Plaintiff at this time.

15.    Does 1 through 200 and Black and White Corporations 1 through 50 are persons and/or entities whose relationships to the named Defendants, or whose acts or omissions give rise to legal responsibility for the damages incurred by Plaintiff, but whose true identities, at the present time, are unknown to Plaintiff. These persons are hereby notified of Plaintiff's intention to join them as defendants if and when additional investigation or discovery reveals the appropriateness of such joinder.

## SUBSTANTIVE ALLEGATIONS

### I.    HOMER AND WILLY'S SUBSTANTIAL, ONGOING FINANCIAL INTERESTS PRIOR TO AND DURING THEIR TENURE AT THE SEC.

#### A.    HOMER'S Many Ongoing Financial Conflicts.

1.    Prior to seeking SEC employment, HOMER had been a partner at the law firm of Sullivan & Cromwell for many years.

2.    HOMER had many clients during that time period, including Chinese company Alibaba, for whom he intimately helped as its legal counsel with its Initial Public Offering in 2014.

3.    A subsidiary of Alibaba is Alipay, which is designed to improve the speed and efficiency of cross-border payments. HOMER recognized that the XRPL Network and its use in cross-border payments represented a direct threat his client Alibaba—a client that provided substantial revenue to HOMER as he was designated as an originating, responsible, and/or affiliated attorney by Sullivan & Cromwell on the Alibaba IPO matter.

4.    During his time at Sullivan & Cromwell, HOMER became intricately aware of the value of cryptocurrency, blockchain technology, and the immense wealth one could accumulate with well-timed investments in both.

5.    On March 23, 2017, during his hearing before the Committee on Banking, Housing and Urban Affairs, United States Senate ("SENATE HEARING"), HOMER testified that during his time as a government employee he would continue to consider returning to his role at Sullivan & Cromwell after his stint at the SEC.

6.      HOMER did return to the employ of Sullivan & Cromwell after his resignation at the SEC, for which he is currently listed as the firm's Senior Policy Adviser and Of Counsel (with his role at the SEC prominently displayed).

7.      HOMER agreed with US Senators at the SENATE HEARING that this consideration, in addition to the lengthy list of his powerful clients, required him to recuse himself from multiple matters before, that may come before, or be substantially implicated while he worked at the SEC. Due to the long, long, long list of matters in which he would have to recuse himself, HOMER was dubbed by many in the media as "The Most Conflicted SEC Chair Ever."

8.      At the SENATE HEARING HOMER agreed to recuse himself from voting on any matter related to the clients of his then-employer, Sullivan & Cromwell. For example— and as a non-exhaustive list—HOMER's clients that he advised included Goldman Sachs, Barclays Capital, UBS, SoftBank Group, Pershing Square, Deutsche Bank, and Alibaba.

**B.      WILLY's Many Ongoing Conflicts.**

9.      WILLY joined the SEC in May 2017, leaving his longtime law practice as a partner at Simpson Thacher. WILLY had been a partner based out of the Silicon Valley office of Simpson Thacher prior to leaving.

10.      During his time at the Silicon Valley office, WILLY became intricately aware of the value of cryptocurrency, blockchain technology, and the immense wealth one could accumulate with well-timed investments in both.

11.      Like HOMER, WILLY also had to disclose his lengthy conflicts of interest prior to employment at the SEC as he had dozens of clients with interests involving the SEC.

12.      In addition to these many client conflicts, WILLY disclosed that STB would concurrently pay WILLY millions of dollars per year while he was employed at the SEC and engaging in official government business that would directly impact STB clients (and WILLY's former and now-current clients).

13.      Upon being pressed by the SEC to explain the concurrent multimillion dollar payments from STB while he worked at the SEC, WILLY further conceded that the amount of these payments would be directly tied to the financial performance of STB rather than a

defined contribution. In other words, STB would generate increased revenue that would in turn flow to WILLY in proportion to STB increasing the "value" it provided to its clients. Value that increased based on WILLY's direct actions while employed at the SEC in favor of STB and its clients.

14.     WILLY entered into his SEC role knowing <u>both</u> that his multimillion-dollar payments from STB were tied to how well STB performed for its clients (that were also WILLY's former and now-current clients) <u>and</u> that he would return to work for STB upon the conclusion of his time at the SEC.

15.     WILLY did, in fact, return to his old firm after leaving the SEC, where he currently is listed as STB's Senior Advisor (with his role at the SEC prominently displayed).

16.     SEC Ethics Counsel, Ms. Shira Minton, advised WILLY in 2017 that his multimillion-dollar, ongoing payout from STB would implicate criminal laws if he did not strictly abide by the restrictions imposed by the SEC.

17.     Recognizing how difficult it would be for him to benefit himself, STB and STB's clients (and WILLY's former and now-current clients) given his conflicts of interest and clear federal regulations prohibiting him from exploiting those interests, WILLY attempted to persuade SEC ethics counsel to carve out an exemption for him.

18.     SEC Ethics Counsel, Ms. Denae Serrano, clearly and unambiguously restated the longstanding, well known conflict of interest requirements for SEC leadership roles by informing WILLY that he would not be allowed to receive special exemptions relieving him from abiding by the ethical and legal requirements.

19.     For example, SEC Ethics Counsel Ms. Serrano informed WILLY on January 24, 2018, that WILLY's extensive involvement in STB represented "a full financial conflict . . . not just an impartiality one."

20.     Because WILLY had repeatedly attempted to downplay this conflict to engage in 'off the books,' 'ad hoc' meetings with key members of STB during his SEC tenure, SEC Ethics Counsel Ms. Serrano informed WILLY in writing that "**you should not be having any meetings with [STB] even group meetings**." (emphasis added).

21.     Concerned that such restrictions would impact his ability to exploit his conflicts, WILLY responded to SEC Ethics Counsel Ms. Serrano that not only did he want to meet 'off the books' and 'ad hoc' with his STB, but also meet with HOMER's firm.

22.     In order to avoid a documentation of his attempts, WILLY asked SEC Ethics Counsel Ms. Serrano to discuss his "restrictions" in a "live" setting with no written record.

23.     SEC Ethics Counsel Ms. Serrano did not take the bait and again warned WILLY –in writing—that nothing changed regarding his massive conflicts with STB. In fact, SEC Ethics Counsel Ms. Serrano again provided WILLY with notice that his proposed course of conduct would be a "criminal financial conflict" and again reminded him of his "ongoing financial interest" in STB. Ms. Serrano was clear: "**[M]eeting with [STB] while having such a conflict is not permitted. As we discussed during your briefing – even calls with them are not permitted**." (emphasis added).

24.     Aware of WILLY's intentions, SEC Ethics Counsel Ms. Serrano implored WILLY to consider that, aside from WILLY's ongoing, actual conflicts, the mere visual of his interactions with STB and his former (and now-current) clients was "**a serious optics issue – you can't be seen to be granting special access to a firm you have financial interest in. [T]his meeting is small enough to raise concerns**." (emphasis added).

25.     WILLY acknowledged SEC Ethics Counsel Ms. Serrano's repeated explanations WILLY's blanket prohibitions on any participation with his paymasters at STB. WILLY then proceeded to promptly and willfully violate them.

26.     For example, Willie maintained written communications with Joshua Bonnie, a partner at STB and former colleague of WILLY both before and after his multiple admonitions explicitly not to have such communications from SEC ethics counsel. The two exchanged multiple communications on how they could organize a way to have in-person meetings on an ad hoc basis.

27.     These communications—and later, in person meetings—occurred <u>after</u> WILLY received repeated admonitions from SEC Ethics Counsel Ms. Serrano to specifically <u>not</u> engage in the very behavior he pursued with Mr. Bonnie.

## II.   ETHEREUM,   CONSENSYS   AND   THE   ETHEREUM   ENTERPRISE ALLIANCE.

28.   The most expensive Initial Coin Offering ("ICO")-launched crypto asset in US history occurred when the Ethereum Network was launched by the Ethereum Foundation in 2014.

29.   On behalf of the SEC, HOMER publicly stated on multiple occasions to multiple media outlets that ICOs—like the Ethereum Network—were unregistered securities offerings.

30.   HOMER withheld the fact that his ongoing, actual conflicts of interest had billion-dollar stakes in the Ethereum Network that would evaporate if he applied the SECs "All ICOs Are Unregistered Securities Offerings" framework to the Ethereum Network in which his former (and now-current) clients and current employers were heavily invested.

31.   A co-creator of Ethereum is Joseph Lubin ("LUBIN"). LUBIN also created a company called Consensys.

32.   The goal of Consensys is to serve as a third-party promoter of the Ethereum blockchain, specifically to enable developers, enterprises and people worldwide to build next-generation applications and launch modern financial infrastructure using the Ether token on the Ethereum Network. Upon information and belief, Consensys had and continues to have a billion-dollar stake in the Ethereum Network.

33.   Consensys purchased a company called Quorum, which focuses on increasing the efficiency of cross-border payments. Though clunky, slow and more expensive than the XRPL Network, Quorum nevertheless would be considered a "competitor" to the XRPL Network in the cross-border payments arena, especially because of who developed Quorum, one of the largest financial institutions in the world, JP Morgan.

34.   Consensys is a client of Sullivan Cromwell, the law firm HOMER worked at prior to taking a job at the SEC; continued to interact with during his tenure at the SEC; actively considering returning to while at the SEC; and does in fact work at presently.

35.   Sullivan Cromwell provided legal services to Consensys during the latter's acquisition of Quorum from JP Morgan, a direct competitor to the XRPL Network.

9

36.    HOMER was therefore required by ethical and legal requirements to recuse himself from matters that implicated the Ethereum Network and especially his former (and now-current) client, Consensys. HOMER did not recuse himself from such matters and directly violated the prohibitions.

37.    At all relevant times, HOMER was aware his firm's client, Consensys, was actively seeking to undermine the XRPL Network in its "competition" involving cross-border transactions.

38.    The Enterprise Ethereum Alliance ("ETHEREUM ALLIANCE") is a member-led industry organization whose objective is to drive the use of the Ethereum blockchain and the Ether token. The ETHEREUM ALLIANCE was created in February 2017. WILLY's former (and now-current) firm, STB, was an active member of the ETHEREUM ALLIANCE during the relevant time period.

39.    WILLY was therefore required by ethical and legal requirements to recuse himself from matters that implicated the Ethereum Network and especially his former (and now-current) employer, STB. WILLY did not recuse himself from such matters and directly violated the prohibitions.

III.    **HOMER AND WILLY CONSPIRE TO COMMIT TORTIOUS INTERFERENCE.**

40.    On November 30, 2017, LUBIN and Consensys announced the Brooklyn Project.

41.    On December 13, 2017, WILLY directs the setup of a meeting with LUBIN, Consensys and lawyers from HOMER's law firm, Sullivan Cromwell, to discuss how the SEC can provide regulatory cover to the Ethereum Network given its genesis via ICO—which HOMER had already publicly stated was a categorical sale of unregistered securities. These efforts by HOMER and WILLY were a direct violation of each's categorical prohibition to engage in business with his former (and now-current) clients.

42.    The following day, on December 14, 2017, a representative of Consensys, along with lawyers from Sullivan Cromwell, state that they are building an alliance with the SEC.

43.     On January 25, 2018, HOMER meets with a firm that maintains a billion-dollar stake in the Ethereum Network, then-Andreesen & Horowitz, and instructs the firm to create a working group to draft a framework for digital assets. Perkins Coie, a law firm and member of the ETHEREUM ALLIANCE, is tasked to lead the working group commissioned by HOMER to provide to the SEC.

44.     Given his conflicts, this was another direct violation of HOMER's prohibitions from serving his former (and now-current) clients while at the SEC.

45.     HOMER did not seek approval, nor receive it, from the SEC to commission a working group on the agency's behalf that would directly benefit HOMER and WILLY's former (and now-current) clients.

46.     HOMER and WILLY created their plan to commission a digital asset working group under the guise of the SEC, but in reality, would be a "personal" endeavor that was not sanctioned by the SEC—a fact HOMER and WILLY hid from the public and intentionally obfuscated at every opportunity.

47.     On March 26, 2018, Perkins Coie transmits the recommendations of the working group in additional to a "Safe Harbor Proposal" for certain digital assets. The only digital asset listed in the Safe Harbor Proposal was the asset in which then-Andreesen & Horowitz stood to most profit from.

48.     On March 28, 2018, Ethereum Network investors meet secretly with WILLY in his personal capacity, outside of official SEC business, seeking to influence WILLY to announce a regulatory "free pass" for the Ethereum Network (in which his former clients had a large investment) even though no official at the agency has sanctioned such conduct.

49.     Specifically, HOMER and WILLY organized the meeting with members of the firm Andreesen Horowitz. Andreesen Horowitz was substantially invested in the Ethereum Network at the time, and were greatly concerned with its investment as the value of the XRPL Network surpassed the Ethereum Network in market capitalization multiple times between December 2017 and the March 28, 2018 meeting.

50.     Representatives from Andreessen Horowitz requested HOMER and WILLY review their "safe harbor" proposal for digital assets. Not coincidentally, the only digital asset

deserving of a safe harbor was the one Andreessen Horowitz was most invested in—the Ether token on the Ethereum Network. HOMER and WILLY engaged in such action knowing they were prohibited from doing so due to their ongoing conflicts.

51.     Through many more meetings with WILLY (in his personal capacity) and Andreessen Horowitz representatives and others, WILLY would incorporate verbatim for use in a speech he concocted with HOMER that the two planned on WILLY to give in the guise of SEC official policy. This speech was designed to provide the Ethereum Network a regulatory free pass to benefit entities that HOMER and WILLY were explicitly prohibited from interacting with due to Defendants' substantial, ongoing financial conflicts of interest.

52.     On April 18, 2018, the secret, unofficial meeting between WILLY and Ethereum Network investors is leaked to then-New York Times journalist, Nathaniel Popper, who likewise reports that Ethereum Network investors were seeking to influence WILLY to grant a "free pass" to the network (*i.e.*, portray the Ethereum Network as having been sanctioned by the SEC as a non-security).

53.     On April 23, 2018, Gary Gensler, in his personal capacity, announces that there is no regulatory clarity for Ether or XRP tokens and that the SEC needs to take multiple, substantial actions to provide market clarity for digital asset holders.

54.     On May 10, 2018, on the Fox Business Network, journalist Charles "Equinox Charlie" Gasparino reports that the Brooklyn Project, Consensys and LUBIN are working closely with regulators after having been "sanctioned by the SEC."

55.     On May 12, 2018, LUBIN states in public forums that he is "making great strides with regulators." Again, at this time, Consensys was a client of Sullivan & Cromwell, for which HOMER could not participate in such discussions.

56.     During this time period, LUBIN and his cronies continued to engage in secret meetings involving HOMER and WILLY which were prohibited by the SEC.

57.     On May 24, 2018, LUBIN claims that he, as a primary promoter of the Ethereum Network, will be allowed to continue to issue Ether tokens as a non-security. In LUBIN's remarks, he lists all the criteria for why Ether is a non-security, tracking all the criteria listed in WILLY's public speech as an SEC official announcing Ether is a non-security.

58.    LUBIN's comments came 21 days <u>before</u> WILLY gave his public speech.

59.    On June 5, 2018, Michael Novogratz, a close personal friend of LUBIN, publicly states he will bet "dimes to donuts" the SEC will declare present day Ether not a security.

60.    WILLY and HOMER continued to discuss their former (and now-current) clients' multi-billion dollar investments in the Ethereum Network, and had discussed necessary actions both needed to take in their personal capacities in order to present the public with the false impression that WILLY and HOMER's personal opinions were SEC-sanctioned opinion and guidance.

61.    At this same time, WILLY and HOMER, in their personal capacities, have been circulating drafts of a public speech that WILLY would orate under the guise of official SEC guidance, knowing-but-concealing from the SEC and the public that it was merely the personal opinions of HOMER and WILLY and further knowing and concealing the fact that the speech was designed to benefit both Defendants' former (and now-current) clients.

62.    Prior to giving the speech, WILLY and HOMER created 53 different drafts and sent 63 emails regarding the speech to each other and various other individuals.

63.    On June 8, 2018, Consensys against meets with the SEC and LUBIN says the market needs the SEC to "scare" certain projects into nonexistence. HOMER and WILLY participated in these meetings to various extents.

64.    On June 13, 2018, a comprehensive memorandum analyzing whether XRP is a security is circulated among SEC staff (herein referred to as "XRP NOT A SECURITY MEMO"). The memorandum concluded XRP was not likely a security.

65.    The SEC decides to continue to allow its staff to trade the XRP token on a routine basis without any pre-approval from its own ethics office.

66.    WILLY was provided a copy of the XRP NOT A SECURITY MEMO prior to giving his orchestrated speech to protect the Ethereum Network and provide it with a regulatory free pass. WILLY knew that, despite SEC staff concluding that XRP and Ether would have to fall into the same regulatory "bucket" given that XRP was more decentralized on every metric evaluated by the SEC as compared to Ether, providing the free pass to XRP as

well would significantly harm his former (and now-current) clients and substantially impair the lucrative employment opportunities available to him once he left the SEC.

67.    On June 14, 2018, WILLY is invited in his capacity as an SEC employee to the Yahoo Finance All Markets Summit, where he announces (against a lit backdrop of his title at the SEC) that the Ethereum Network and its Ether token is not considered a security by the SEC (herein referred to as "THE SPEECH").

68.    HOMER and WILLY concocted THE SPEECH outside of the scope of their employment with the SEC given that both were legally and ethically prohibited from espousing such market-moving guidance that would directly benefit their former (and now-current) clients.

69.    HOMER and WILLY purposefully chose to omit reference to the XRPL Network and XRP token because doing so would harm the XRPL Network and, in turn, harm Plaintiff and all XRPL Network Users.

70.    Especially in light of the similarity between the XRPL Network and the Ethereum Network, and the SEC's XRP NOT A SECURITY MEMO, HOMER and WILLY had no reasonable basis to exclude the XRPL Network and XRP from THE SPEECH other than the goal to tortiously interfere with Plaintiff's valid business expectancy in the network and to benefit their former (and now-current) clients.

71.    Andreessen Horowitz's profits from its Ethereum Network investment since THE SPEECH is measured in billions of dollars—the firm at which WILLY was quickly employed by after leaving the SEC.

72.    Andreessen Horowitz hired WILLY as an employee shortly after WILLY helped file the legal claim against XRPL Network Users.

73.    In fact, WILLY and HOMER had entered into a conspiracy to pretend THE SPEECH was official SEC guidance knowing this to be false.

74.    Many media outlets, following THE SPEECH, questioned why only Bitcoin and Ether were mentioned and not XRP given the XRPL Network's open and obvious similarities to the Bitcoin and Ethereum Networks (with the only difference being the XRPL Network was both less expensive and faster to use). HOMER and WILLY created THE SPEECH to

intentionally interfere with Plaintiff's and all XRPL Network Users' valid business expectancy in the XRPL Network to cripple it and permit its direct competitor, the Ethereum Network, to siphon market share given HOMER and WILLY's former (and now-current) clients' investments in the Ethereum Network.

75.    Following THE SPEECH, HOMER and WILLY repeatedly made public statements under the aura of their respective roles at the SEC that THE SPEECH served as the basis for the SEC's framework for market participants to evaluate whether blockchain networks are securities. No one at the SEC corrected the record that THE SPEECH was not official SEC guidance following these repeated public statements.

76.    To further obfuscate the origin of THE SPEECH, HOMER and WILLY continued to engage in a public relations blitz referring to THE SPEECH as the SEC's official position.

77.    As other third-parties digested the contents and implications of THE SPEECH for digital assets, all of them were under the clear impression that THE SPEECH concocted between HOMER and WILLY and given by WILLY was official SEC guidance.

78.    THE SPEECH has since been the cornerstone for the near-exponential rise in the value of the Ethereum Network and correspondingly been responsible for the plummeting in value of the XRPL Network—by intentional design of HOMER and WILLY.

79.    During this same time period, HOMER and WILLY manipulated and guided SEC staff to launch an investigation into their former (and now-current) clients' direct competitor, the XRPL Network, for the benefit of those entities and to the detriment of Plaintiff.

80.    HOMER and WILLY engaged in this manipulation even though ethical and legal requirements prevented them from doing so.

81.    HOMER confirmed he would retire from the SEC on November 16, 2020 but that his retirement would not be effective until later in the year. WILLY confirmed he would retire from the SEC on October 27, 2020 but that his retirement likewise would not be effective until later in the year.

82.    HOMER and WILLY announced their respective retirements but knew they had to remain at the SEC in order to bring their conspiracy to fruition, culminating in a baseless federal lawsuit against XRPL Network Users—and even the XRPL Network itself, curiously—that by its very filing would directly benefit (and did directly benefit) HOMER and WILLY's former (and now-current) clients.

83.    That federal lawsuit was filed on December 22, 2020.

84.    HOMER resigned from the SEC on December 23, 2020.

85.    One River Digital Asset Management ("One River") is one of the many entities that now employ HOMER post-SEC. His hiring was announced five months after One River placed a hugely profitable, billion-dollar bet in favor of the Bitcoin and the Ethereum Networks in October 2020. Curiously, One River did not place a bet on the XRPL Network despite it having one of the largest market values behind the Bitcoin and Ethereum Networks.

86.    HOMER voted in favor of the lawsuit and without disclosing to his fellow SEC Commissioners that the lawsuit's purpose was to directly impair the valid business expectancy of XRPL Network Users and benefit his former (and now-current) clients.

87.    In his vote, HOMER violated his ethical and legal restrictions on voting on matters that directly affected his former (and now-current) clients.

88.    Since HOMER and WILLY left the employ of the SEC, each has gone on to work at and for digital asset companies where they now have substantial ownership stakes in the Ethereum Network and the Ether token.

**IV.    PLAINTIFF AND ALL XRPL NETWORK USERS HAD AND CONTINUE TO HAVE A VALID BUSINESS EXPECTANCY IN THE XRPL NETWORK.**

89.    Similar in concept to Bitcoin (albeit at a much faster transaction speed and vastly cleaner in energy usage), the XRPL Network is a blockchain software that operates solely on participants' willingness to process and verify transactions on the network.

90.    No individual or entity—or groups of individuals or entities—own the XRPL Network. Therefore, there are no third-party promoters, just the XRPL Network Users themselves.

91.    XRP is not a security *per se*—much as the oranges in the orange groves in the seminal *Howey* securities case were not securities—but all XRPL Network Users, just like all other blockchain network users, share a common goal to maintain and grow the network.

92.    Like the Facebook and Twitter networks that are orders of magnitude more valuable when billions of users utilize the networks as opposed to just dozens of users, so too is the XRPL Network more valuable the more XRPL Network Users there are.

93.    Unlike the Facebook and Twitter networks, which are owned each by a single, public corporation, the XRPL Network is literally owned by the users themselves, including Plaintiff.

94.    One of many business purposes of the XRPL Network is to allow users to transact value globally—and indeed, in an interstellar fashion based on its compatibility with satellites—in an instant matter and for a minute fraction of the cost of traditional value transfers charged by large financial institutions (like those that were HOMER and WILLY's former clients while each worked at the SEC).

95.    Consequently, Plaintiff and the XRPL Network Users maintain a valid business expectancy in the XRLP Network, an expectancy based on vastly more than "mere hope."

96.    At the time of this filing, hundreds of business entities are likewise XRPL Network Users utilize the XRPL Network to transfer value in seconds, and for fractions of fees charged by large financial institutions (such as HOMER and WILLY's former and now-current clients), Bitcoin, and even Ethereum Enterprises (also HOMER and WILLY's former and now-current clients).

97.    In fact, the SEC is an XRPL Network User itself, running a validator node on the network to monitor transactions.

98.    More specifically, prior to the December 23, 2020 federal lawsuit, the XRP token was traded on every major digital asset exchange in the United states, including Kraken, Binance US and Uncle Brian's Coinbase, Inc (among many others).

99.    Immediately after HOMER and WILLY completed their conspiracy, the vast majority of US exchanges terminated or substantially impaired XRPL Network Users' ability to transact XRP on their platforms.

17

**V.   HOMER AND WILLY HAD EXPLICIT KNOWLEDGE OF PLAINTIFFS' VALID BUSINESS EXPECTANCY IN THE XRPL NETWORK.**

100.   HOMER and WILLY were intricately aware of the XRPL Network and its users during their tenure at the SEC.

101.   Reasons demonstrating HOMER and WILLY's knowledge (but by no means exhaustive) include: (i) the many XRPL Network Users that had inquired into the SEC and HOMER and WILLY as to the security status of the network; (ii) HOMER and WILLY's personal consultations with enterprises that utilized the XRPL Network for business purposes; and (iii) the SEC's efforts to utilize the XRPL Network by running its own validator node on the network.

102.   HOMER and WILLY were also intricately aware that their former (and now current) clients had a vested interest in destruction of the XRPL Network as those entities and individuals were overwhelming investing in the XRPL Network's competitor, the Ethereum Network.

103.   HOMER and WILLY's former (and now-current) clients discussed with HOMER and WILLY that failure to stop the XRPL Network, especially while it was outpacing the Ethereum Network in growth at the time, would substantially impair their profits.

104.   HOMER and WILLY realized that failure to use their personal efforts to stop the XRPL Network would substantially impair their own financial interests, for which they had ongoing conflicts while at the SEC.

**VI.   HOMER AND WILLY'S INTENTIONAL INFERENCE WITH XRPL NETWORK USERS' VALID BUSINESS EXPECTANCY.**

105.   HOMER and WILLY knew that by filing a baseless claim against XRPL Network Users—as they walked out the door of the SEC to work at competitor firms of the XRPL Network—the claim would likewise critically impair the XRPL Network and cause its destruction. HOMER and WILLY knew the claim was baseless as many SEC employees had already concluded in the XRP NOT A SECURITY MEMO that XRP was likely not a security.

106.   HOMER and WILLY's intentional interference was grossly improper as SEC officials never sanctioned either HOMER or WILLY to claim—and more importantly, perpetuate—that SEC's official position was that Bitcoin and Ether tokens were not securities.

107.   HOMER and WILLY's intentional interference also was grossly improper because it was in direct violation of HOMER and WILLY's substantial restrictions on engaging in activity that directly or indirectly benefited the firms in which they had a direct ongoing financial interest.

108.   In fact, as of the time of this filing, the SEC has represented before multiple federal district courts across the nation that it has <u>not once</u> officially determined the security status of Bitcoin and Ether.

109.   HOMER and WILLY knew that by filing a baseless claim on their way out the door at the SEC, their replacements would have no choice but to continue the claim, thereby intentionally interfering with the valid business expectancy of XRPL Network Users in a sustained, multi-year litigation battle.

110.   HOMER and WILLY knew authorizing the baseless claim directly involved their respective law firms and the clients of their law firms, yet refused to recuse themselves from the decision in violation of their ethical obligations and federal conflict of interest provisions.

## VII.   HOMER AND WILLY'S TORTIOUS INTERFERENCE CAUSED SUBSTANTIAL DAMAGE TO XRPL NETWORK USERS' VALID BUSINESS EXPECTANCY.

111.   Prior to the public manifestation of HOMER and WILLY's intentional interference with XRPL Network Users' valid business expectancy, the network had a value of approximately $70 Billion. Upon the announcement based on HOMER and WILLY's intentional interference, the XRPL Network lost approximately $42 Billion in value. The XRPL Network has also not enjoyed the prior years' increase in value to an extent similar to other blockchain networks due to HOMER and WILLY's tortious interference.

112.   HOMER and WILLY's former (and now current) clients immediately benefited from the immense drop in the XRPL Network's value as the value was moved in part to the Ethereum Network and Ethereum Entities.

113.    As one of many examples of the utility of the XRPL Network, many entities such as Moneygram International and Bitso utilized the XRPL Network for cross-border payments and remittances. As a result of HOMER and WILLY's tortious interference, the XRPL Network dropped approximately 10% of utility in this one, narrow business use case for XRPL Network Users.

114.    Worse, the price of XRP (and therefore the value of the XRPL Network) has been artificially suppressed as a direct and proximate cause of HOMER and WILLY's intentional interference.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

116.    Plaintiff seeks class certification on behalf of a class defined as follows

> **NATIONWIDE CLASS**: All persons or entities who transacted on the XRPL Network and maintained ownership of one or more XRP tokens any time from June 2012 through December 22, 2020 ("the Class Period").

117.    Plaintiff reserves the right to modify or refine the definition of the Class based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

118.    Excluded from the class are: (a) any judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assignees, subsidiaries, and any entity in which Defendants engaged in furtherance of their tortious interference, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for plaintiffs and defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

119.    **Ascertainability.**  The proposed class is readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a

class. Further, the class can be readily identified through the XRPL Network itself which is a public, immutable ledger that records all transactions ever occurring on it.

120. **Numerosity (Rule 23(a)(1)).** The class is so numerous that joinder of individual members herein is impractical. The exact number of members of the class, as herein identified and described, is not known, upon information and belief there are tens of thousands (if not hundreds of thousands) of XRPL Network Users who transacted on the XRPL network.

121. **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual class members, including the following:

- Whether defendants engaged in tortious interference of Plaintiff's valid business expectancy in the XRPL Network;

- Whether Plaintiff and the members of the class are entitled to damages and the amount in measure thereof; and

- Whether Plaintiff and members of the class are entitled to declaratory and injunctive relief.

122. **Typicality (Rule 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the proposed class. Plaintiff and members of the class (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the class.

123. **Adequacy (Rule 23(a)(4)).** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the class. Plaintiff has retained counsel competent and experienced in complex litigation in class actions. Plaintiff has no interest that is antagonistic to those of the class, and defendants have no defense that is unique to plaintiffs. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the class, and she has the resources to do so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of other members of the class.

124. **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy in joinder of all members of the class is impracticable. The prosecution of separate actions by individual members of the class would impose heavy burdens upon the

courts and defendants, would create a risk of inconsistent or varying at adjudications of the questions of law and fact common to members of the class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision making.

125.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting the individual members of the class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

126.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because defendants acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the class as a whole.

127.    Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF
## FIRST CAUSE OF ACTION
### Tortious Interference With Business Expectancy
### By All Defendants
### On Behalf of All Plaintiffs and Class Members

Plaintiff hereby incorporates by reference all the allegations contained in this Complaint as if the same were fully set forth herein.

128.    At all relevant times a valid business expectancy existed between and among Plaintiff and XRPL Network Users regarding the XRPL network.

129.    HOMER and WILLY were intimately and acutely aware that the value of XRP for XRPL Network Users and XRPL developers was dependent on the increasing utility of the

XRPL Network. Both knew that XRPL Network Users and XRPL developers had a valid business expectancy in the maintenance and growth of the XRPL network.

130.    By engaging in unlawful and improper actions—specifically those actions set forth above that were in furtherance of the benefit of HOMER and WILLY's former (and now-current) clients in the face of direct, legal prohibitions to do so—HOMER and WILLY intentionally interfered with Plaintiff's and all XRPL Network Users' valid business expectancy in the XRPL Network.

131.    HOMER and WILLY's intentional interference caused a breach in the business expectancy, critically impairing it (and continually impairing it) with the ultimate goal of terminating it.

132.    HOMER and WILLY's intentional interference directly and proximately caused Plaintiff and all XRPL Network Users to suffer damages in an amount to be determined at trial, but no less that $42 Billion.

## SECOND CAUSE OF ACTION

**Conspiracy To Commit Tortious Interference With Business Expectancy**

**By All Defendants**

**On Behalf of All Plaintiffs and Class Members**

Plaintiff hereby incorporates by reference all the allegations contained in this Complaint as if the same were fully set forth herein.

133.    HOMER and WILLY, acting completely outside the scope of their employment with the SEC and in their own personal capacities, agreed to leverage their relationships with their former (and now-current) clients to tortiously interfere with Plaintiff's valid business expectancy in the XRPL Network through unlawful purposes by unlawful means.

134.    Specifically, as set forth above, HOMER and WILLY repeatedly communicated and met with their former (and now-current) clients in their official capacities at the SEC despite knowing they were lawfully prohibited from doing so based on their own conflicts of interest disclosures, federal regulations prohibiting them from acting for the benefit of parties in which they had such ongoing conflicts, and explicit SEC ethics counsel guidance likewise prohibiting such conduct.

135.    HOMER and WILLY are additionally liable for any tortious act, even unknown to them, committed in furtherance of the conspiracy, including acts not personally committed.

136.    Plaintiff, and other similarly situated class members, suffered damages of approximately $42 Billion, though perhaps in excess of that number as a result of Defendants' tortious interference to XRPL Network Users and the XRPL Network.

## THIRD CAUSE OF ACTION

### Aiding And Abetting Tortious Interference With Business Expectancy
### By All Defendants

Plaintiff hereby incorporates by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

137.    As set forth above, HOMER and WILLY aided and abetted each other in tortious conduct for which both knew they would be liable to Plaintiff.

138.    Both HOMER and WILLY were aware that each were engaging in prohibited conduct due to their known, lengthy conflicts of interest with their former (and now-current) clients.

139.    Both HOMER and WILLY provided substantial assistance and encouragement to each other with the primary intent of critically impairing the XRPL Network for the benefit of their former (and now-current) clients.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated, prays for judgment against Defendants as to each and every count, including:

- An order certifying this action and the Class requested herein as a class action, designating Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel to the Class;

- An order declaring that Defendants' actions, as set forth above, constitute tortious interference with Class Members' business expectancy in the XRPL Network as set forth above and that Defendants are liable to Plaintiff and the Class, as described herein, for damages arising therefrom;

- A judgment awarding Plaintiff and the Class all appropriate damages in an amount to be determined at trial;
- A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement;
- A judgment awarding Plaintiff and the Class prejudgment and post-judgment interest, as permitted by law;
- A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees, as permitted by law; and
- Grant such other legal, equitable or further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Dated this 12th day of April, 2022.

By:   _/s/ Frederick A. Rispoli_____
Frederick A. Rispoli
420 West Roosevelt Street
Phoenix, Arizona 85003
Tel: 602-284-5520
Fred@FredRispoli.com
*Attorney for Plaintiff Shannon O'Leary*